IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| JAKE ELLIS DAUGHTRY, | § | |
| SANDRA MILLER DAUGHTRY, | § | |
| INDIVIDUALLY, AND | § | |
| D/B/A JAKE'S FIREWORKS, | § | |
| JOSEPH ELLIS DAUGHTRY, | § | |
| RIGHT PRICE CHEMICALS, LLC, | § | |
| BEST BUY INDUSTRIAL SUPPLY, LLC, | § | |
| LAB CHEMICAL SUPPLY, LLC, AND | § | |
| DAUGHTRY INVESTMENTS, LLC | § | |
| | § | |
| | § | CIVIL ACTION NO. |
| | § | _____ |
| V. | § | |
| | § | |
| SILVER FERN CHEMICAL, INC., | § | |
| SAM KING, TIMOTHY LYONS, | § | |
| AND GILDA FRANCO | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW Plaintiffs Jake Daughtry, Sandra Daughtry, Individually, and D/B/A Jake's Fireworks, Joe Daughtry ("Daughtry Family" or Plaintiffs), Right Price Chemicals, LLC ("RPC"), Best Buy Industrial Supply, LLC ("BBIS"), Lab Chemical Supply, LLC, and Daughtry Investments, in the above noted and styled Plaintiffs' Original Complaint alleging that Silver Fern Chemical, Inc ("Silver Fern") is liable for the causes of action set forth. Plaintiffs reserve the right to replead if new claims and issues arise upon

further development of the facts, as permitted by law. In support thereof Plaintiffs would respectfully show the following:

## JURISDICTION AND VENUE

1.      Jurisdiction is conferred upon this Court Pursuant to 28 U.S.C.A. §1332 because the matters in controversy arise under the Constitution and laws of the United States. Furthermore, this Court has supplemental jurisdiction over various state and common law claims pursuant to 28 U.S.C. §1367.

2.      Pursuant to 28 U.S.C. §1391 this Court is the proper Venue over this cause, as all events and omissions giving rise to Plaintiffs claims occurred and may be consolidated in the Eastern District of Texas, Beaumont Division as they all reflect common issues of law and fact.

## STANDING

3.      Plaintiffs have standing to bring this lawsuit because they have suffered injury, caused by Defendants' wrongful conduct.  The injuries suffered by Plaintiffs as a result of Defendants' actions may be redressed by this Court.

## PARTIES

4.      Plaintiffs live in Jefferson County, Texas.

5.    Sam King is an individual that may be served at his home at: 396 Hot Springs Rd., Santa Barbara California 93108.

6.    Gilda Franco is an individual that may be served at her workplace at: 22626 Queen Anne Ave. N., Seattle Washington 98109.

7.    Silver Fern Chemical, Inc. is a domestic corporation and may be served through its registered agents: Lisa King and Scott Lyons at 2226 Queen Anne Ave. N., Seattle, Washington 98108.

8.    Timothy Lyons is an individual that may be served at the Silver Fern Chemical business location at: 22626 Queen Anne Ave. N., Seattle Washington 98109.

9.    Although not a party, this pleading challenges the constitutionality of a federal or state statute, requiring service of notice of the constitutional question and a copy of the pleading on the U.S. Attorney General at: U.S. Department of Justice, 950 Pennsylvania Avenue, NW Washington, DC 20530.

## FACTUAL BACKGROUND

### SILVER FERN'S INVOLVEMENT IN FALSE CRIMINAL ALLEGATIONS

**1.    Prior to the raid on July 15, 2020, Silver Fern Chemical was the only chemical supplier identified by the Government that supplied 1,4 Butanediol to RPC in**

**Jefferson County, Texas which Silver Fern sold over the internet.**

```
15  Q.   Okay.  Now, Silver Fern -- we subpoenaed their records
16  also; is that correct?
17  A.   Yes, ma'am.
18  Q.   And we determined that, as far as we can tell right now,
19  that that was their sole supplier for BDO to Right Price
20  Chemicals.
21  A.   Yes.
22  Q.   Between those time frames you mentioned.
23  A.   Yes.
```

[Exhibit 1 - 1:20-CR-00055 Dkt 272 at p.20 of 117, L 15-23].

2.    On June 3, 2020 a Federal Grand Jury indictment was returned against the Defendants alleging violations of 21 U.S.C. 846 and 841, 21 U.S.C. 802(32)(A), 813, and 841(a)(1) and (b)(1)(c), and 18 U.S.C. 856(a)(1), 21 U.S.C. 841(g), 21 U.S.C. 841(g)(1)(B) and (g)(2)(A)(i), 21 U.S.C. 856(a)(1), 21 U.S.C. 1957; the indictment additionally sought forfeiture of certain real and personal property in the form of a money judgement pursuant to 21 U.S.C. 853 and 881.

3.    The indictment alleges a conspiracy to possess with intent to distribute a controlled substance analogue and a conspiracy to

distribute a date rape drug over the internet to an "unauthorized purchaser." The chemical in question is called 1,4 Butanediol and is an industrial solvent that has numerous innocuous uses.[1]

4.   At the heart of the Government's allegations is the question of whether the sales of 1,4 Butanediol were intended for human consumption, as required by the statute. In its filings and arguments in various court hearings the Government has alleged that RPC and the Daughtrys were not employing voluntary industry practices to ensure sales were not diverted from "legitimate channels".

5.   The Daughtry Family is actually innocent of the allegations, but before they could prove their innocence, Jake Daughtry, with the help of a forensic computer expert, was able to prove that Silver Fern Chemicals, Inc. had submitted fabricated documents to the Government that misrepresented the information that RPC had received from Silver Fern Chemicals, Inc., including representations that RPC had received an SDS (Safety Data Sheet) from Silver Fern Chemicals, Inc. when it in-fact had not. Exhibit 3 -

---

[1] Cargill recently issued a press release that it was to build the first commercial-scale, renewable BDO facility in the U.S to satisfy consumer demand for sustainable products. Cargill manufactures butanediol for consumer products. https://www.cargill.com/2021/cargill-and-helm-partner-to-build-$300m-facility – Exhibit 2.

Expert Report of Cyopsis Digital Forensics, eDiscovery & Investigations, August 29, 2021.

- This Silver Fern produced email, has an additional attachment, and an extra sentence in the body of the email.

From:        Gilda Franco <DOM/EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/RECIPIENTS/GILDA>
Sent:        6/6/2017 2:32:03 PM -0600
To:          jake@rightpricechemicals.com
Subject:     RE: Ref. New PO 2203-0606
Attachments: CC receipt Inv 21197.pdf; SFC_BDO_1 4-Butanediol_SDS.pdf

Jake,

Here is the payment receipt for the past due invoice 21197.

I apologize for not providing a copy of the invoice in advance. I assure this will not happen again.

I will process the new order for shipment ASAP. Please retain our SDS for your records.

Thank you,
**GILDA FRANCO**
Office: 1-866-282-3384
Direct Line: 562-758-7051
www.silverfernchemical.com



**SILVER FERN**
CHEMICAL INC

6

From:       Gilda Franco <gilda@silverfernchemical.com>
Sent:       6/6/2017 2:32:03 PM -0600
To:         jake@rightpricechemicals.com
Subject:    FW: Ref. New PO 2203-0606
Attachments: CC receipt Inv 21197.pdf

Jake,

Here is the payment receipt for the past due invoice 21197.

I apologize for not providing a copy of the invoice in advance. I assure this will not happen again.

I will process the new order for shipment ASAP.

Thank you.

**GILDA FRANCO**

Office: 1-866-282-3384

Direct Line: 562-758-7051

www.silverfernchemical.com

**Findings of the Investigation:**

Due to the changes and missing data from the Silver Fern production, I cannot validate emails the emails. Two receiving accounts with metadata, received emails without the additional attachments and text within the body of the emails. Silver Fern's own emails show inconsistent changes and do not appear to be legitimate.

6.   RPC used Lexiconn Internet Services, Inc. to host its email domain. Jake Daughtry would blind copy his work email with personal emails. In reviewing discovery, Daughtry discovered that the emails between Silver Fern and himself did not match the originals from the server nor the blind copies to Jake Daughtry's personal email.

7.  A number of emails between Silver Fern and Jake Daughtry did not match the originals from the server nor the blind copies to the personal email. The primary difference in the emails was the addition of an attached SDS sheet along with added text in the body of the email instructing the receiver to refer to the newly attached SDS sheet which was never provided to RPC by Silver Fern. The fabricated SDS was not part of the original bill of lading. Exhibit 4.

8.  Below, is the actual SDS information likely provided to RPC:

## SECTION 4: FIRST AID MEASURES

**Eye Contact:**
Check for and remove any contact lenses. Immediately flush eyes with plenty of water for at least 15 minutes, occasionally lifting the upper and lower eyelids. Get medical attention immediately.

**Skin Contact:**
Immediately flush skin with plenty of water for at least 15 minutes while removing contaminated clothing and shoes. Wash clothing before reuse. Clean shoes thoroughly before reuse. Get medical attention immediately.

**Inhalation:**
Move exposed person to fresh air. If not breathing, if breathing is irregular or if respiratory arrest occurs, provide artificial respiration or oxygen by trained personnel. Loosen tight clothing such as a collar, tie, belt or waistband. Get medical attention immediately.

**Ingestion:**
Wash out mouth and water. Do not induce vomiting unless directed to do so by medical personnel. Never give anything by mouth to an unconscious person. Get medical attention immediately.

9.  Meanwhile, RPC learned that a fabricated SDS had been presented to the government by Silver Fern and that Silver Fern had actually gone back to old email correspondence between Silver Fern and RPC and modified the emails to make the emails look like they had included the fabricated SDS as an attachment. The fabricated SDS

contained information that is inaccurate and, importantly, this information was never sent to RPC before the allegations that lead to the attempt to prosecute the Daughtry family. A comparison of the two documents is essential to understanding the nature of fraudulent activity by Silver Fern. Here is the same section of the fabricated SDS.

SECTION 4: FIRST AID MEASURES

4.1. Description of first aid measures

| | |
|---|---|
| In case of skin contact: | Wash off immediately with soap and plenty of water. Remove contaminated clothing and wash skin with plenty of soap and water. Flush with Lukwarm water for 15 minutes Seek medical attention if ill effecto or irritation develops |
| In case of eye contact: | Flush with plenty of water for at least 15 minutes, occasionally lifting the upper and lower eyelids.h If eye irritation persists; Get medical advice/attention |
| If swallowed: | If victim is drowsy or unconscious, plase on the left side with head down. If victim is conscious and able to swallow, have victim drink water to dilute. NEVER give anything by the mouth if victim is unconscious or having convulstions. |

Induce vomiting only if advised by a physician or Poison Control Center.
CALL A PHYSICIAN OR POISON CONTROL CENTER IMMEDIATELY!
If vomiting does occur, have victim lean forward to reduce risk of aspiration.
PROMPT ACTION IS ESSENTIAL

If inhaled:

If symptoms are experienced, move victim to fresh air.
Give oxygen or artificial respiration as needed.
Obtain emergency medical attention.
Prompt action is essential

4.2. Most important symptoms and effects, both acute and delayed



Accidental or intentional ingestions can cause depressed repiratory rates, vomiting, seizures, unconsciousness
and death

Harmful by ingestion
Ingestion may cause CNS depression (drowsiness and dizziness) and respiratory failure

Vapors may cause drowsiness and dizziness
Always observe self-protection methods
Move out of dangerous area
If you feel unwell, seek medical advice (Show the label if possible)
Show this material safety data sheet to the doctor in attendance

4.3. Indication of any immediate medical attention and special treatment needed

Symptoms: Accidental or intentional ingestion can cause depressed respiratory rates, vomiting, seizures,
unconsciousness and death.

Hazards: 1,4-Butanediol (BDO) is rapidly absorbed and metabolized to gamma-hydroxybutyrate (GHB) which
is thought to produce the neurotoxic effects of BDO. BOD can completely inhibit the enzyme that metabolizes
alcohol, hence combined exposures may increase the toxic effects of alcohol and delay and prolong the toxicity
of BDO.

Treatment:   Treat symptomatically
Treatment of overexposure should be directed at the control of symptoms and clinical
condition of the patient

10.   Silver Fern had created a presentation to the Government it was

supplying RPC with information that it had not been providing RPC.

The documents' materiality stems from the fact that it purports to

tie 1,4 Butanediol to the date rape drug GHB and warn distributors

that unauthorized purchasers were using the chemical for personal

consumption. The information on the fabricated SDS was never

provided to RPC or the Daughtry family before their property was raided and seized.

11.   Despite conducting a three-year investigation into the Daughtrys alleged "illegal drug distribution", the Government waited forty-two days to obtain and execute arrest and search warrants in the wake of the indictment.

12.   On July 15, 2020, just after the July 4th firework season, multiple agencies including the Drug Enforcement Agency conducted a raid on multiple properties including the fireworks warehouse and the Plaintiffs' personal residences. They seized cash, bank accounts, cell phones, vehicles, computers, real estate, and buildings including all of its contents. They seized all of the family business documents that were essential to the continued operations of the businesses.

13.   The chemical 1,4 Butanediol is not a controlled substance. It is not a listed chemical. 1,4 Butanediol is not a prescribable substance nor does it require a registration to dispense, sell, or possess. The chemical 1,4 Butanediol is not part of the closed system of DEA Registration subject to Diversion Control.

14.    A prerequisite for any substance to become a "controlled substance analogue" is that the substance be intended for human consumption. Therefore, the distribution of 1,4 Butanediol is legal if the distribution is not intended for human consumption. The 1,4 Butanediol distributed by RPC was not intended for human consumption.

15.    1,4 Butanediol is known to commonly be utilized as a floor stripper and a wheel-well cleaner for automobiles. It can also be utilized in commercial/industrial settings, in the process of laboratory research operations, and as an electronics cleaner among uses in numerous other consumer products such as spandex products manufactured by Lululemon.

16.    At the time of the detention hearing for Jake Daughtry, Walmart, Amazon and E-bay all had 1,4 Butanediol for sale on their own websites in similar quantities for similar or higher prices. Exhibits 5-7.

17.    On July 13, 2020, the Government proceeded with attempts at separate civil forfeiture efforts before The Honorable Judge Michael Truncale. An Emergency Ex Parte Motion was also filed requesting a temporary restraining order under 28 U.S.C. 856(e). [1:20-CV-

305] The Court Granted the Government's request based at least in part on misleading and false information provided by Silver Fern Chemicals ("SFC").

18.    Additionally, the Government sought to show that RPC should have behaved like Silver Fern, by providing this information to the purchasers of the product. The Government sought to contrast the "good behavior" of Silver Fern with the alleged failure of RPC to include the SDS it had been provided by Silver Fern. RPC was, therefore, held to an impossible standard by the Government as RPC was expected to have sent information it never actually received from Silver Fern. The Silver Fern SDS was modified by SFC employees and never sent to RPC making it impossible for RPC to meet a fictitious, "voluntary industry standard" the Government sought to impose.

19.    On November 7, 2019, without Plaintiffs' knowledge, the Government began requesting information from Silver Fern Chemical, Inc., and a cooperative relationship was formed between the Government and Silver Fern. It is during this relationship that the fraud was committed, and fabricated evidence was developed to

create a false history of "vetting procedures" that did not exist in reality.

20.   On December 4, 2019, less than 30-days after the Government's initial subpoena for information, a Silver Fern employee sent an email to RPC stating:  *"It has come to our attention that although 1,4-Butanediol ("1,4-BDO")* **is not a controlled substance** *listed by the DEA, it can be diverted for illicit use."* and *"We can ship this out ASAP, but before we ship this to you, we need to have you fill out another regulatory form from the DEA."* (emphasis added)

21.   On September 2, 2020, a hearing was held before Judge Truncale wherein the Government called a private contractor and former DEA Agent named Jerry Salameh to the stand. Mr. Salameh "authenticated" a number of exhibits during his testimony. Through AUSA Wells, the Government admitted and relied on a fabricated SDS sheet from SFC which resulted in an injunction that prevented the Daughtrys from opening their lawful businesses [1:20-CV-305 at Dkt. 38-4]. Plaintiffs suffered egregious harm by eliminating their sources of income and severely limiting their ability to finance their defenses.

22.   Around March of 2021, the Government provided fabricated emails from SFC to Jake Daughtry in discovery for the criminal case. These emails were produced in PDF format only, resulting in all meta data being stripped from these fabricated SFC emails.

23.   Through his defense counsel, Jake Daughtry, sent his own subpoena to Silver Fern to obtain electronic versions of the documents for further analysis.

24.   Silver Fern and the Government coordinated their efforts to omit information from the subpoena response to Daughtry, importantly, Silver Fern omitted any internal Silver Fern SDS sheet(s) in any response to the government's first four subpoenas.

25.   Silver Fern further omitted at least three folders of purported "order" information in any of their responses to the government's first four subpoenas.

26.   The Silver Fern response to the Daughtry subpoena does not match the Silver Fern documents produced by the government to Daughtry in criminal discovery.

27.   Silver Fern had omitted from its response all email correspondence from the government regarding RPC as well as all email correspondence between Silver Fern and RPC.

28.   In August of 2021, RPC worked with an expert to determine that the emails were altered, and they had been used in the prosecution of the Plaintiffs. The emails provided not just one example but more than a dozen.

29.   The Government attorney that used the emails in the criminal prosecution was removed from the case. In hindsight, it appears clear that Silver Fern Chemical, their outside counsel Mr. Friedman, Government agents or a combination of these actors have conspired to obstruct justice and commit fraud on the Plaintiffs, multiple courts in the Eastern District of Texas, and the justice system as a whole.

30.   The Government then allowed the known fabricator, Silver Fern, to conduct its own internal investigation to determine how or why it passed fabricated emails to the Government in response to a subpoena. In Silver Fern's response to the Government's request, Silver Fern apologized and then provided one example of a "real" email sent to Plaintiff that provided the needed evidence that 1,4

Butanediol was similar to gamma hydroxybutyric acid (GHB). The Government then asserted to Plaintiffs that it was satisfied with Silver Fern's investigation and that the Government had concluded any investigation of its own. A computer expert was able to verify that this single email was also fabricated.

31.  In January 2022, the Government issued a memo to Jake Daughtry from Silver Fern's paralegal which is dated December 9, 2021. Exhibits 8-8B. In the memo, a December 8, 2021 Silver Fern TEAMS meeting is referenced that purports to contain the details related to how the emails were fabricated by a Silver Fern employee, Gilda Franco, and then tendered to the Government for use in the

prosecution                    of                    the                    Plaintiffs.

> Ms. Franco rubbed her brow and yawned multiple times, before stating: "I mean, the only explanation I can think of is that I was attaching them after the fact to… *ummm*… ensure that they were having a copy of the SDS."
>
> Mr. Friedman asked for clarification.  Ms. Franco yawned. "Sorry." She paused and then said, "Attaching the SDS after I sent the original email so they would have copy of the SDS."
>
> Mr. Friedman informed her that we haven't found evidence that she actually sent the SDS to the shipper on these specific occasions under discussion.  He then said, "We can come up with no other explanation than that after you sent this email to them, at some point, you perhaps realized that the SDS hadn't been attached, that you, on Silver Fern's end, you just went and added them to the email as a matter of our record. You changed the email, but the email that actually went to them didn't contain the SDS and didn't reference the SDS. Is that possible?"
>
> Ms. Franco then stated: "Yeah, it could be."
>
> Mr. Friedman then asked her what motivated her to do this and whether anyone else influenced her decision to alter the emails.
>
> FRIEDMAN: "What made you want to do that?"
>
> FRANCO: "Just to cover our tracks. To cover my tracks."

32.  In the memo, it was identified that the emails to RPC were altered in 2021 after Mr. Friedman, Silver Fern's attorney became involved and after Tim Lyons contacted Gilda Franco in February 2021 to "find any additional email if it existed regarding the SDSs."

33.  In the memo, there is reference to confusion related to implementation of when SDSs would be sent at Silver Fern and there was indication that Silver Fern CSRs had access to RPC emails.

34.  The Government was relying on Silver Fern communications in an attempt to establish concepts such as the appropriate "industry

standard" and protocol for "due diligence" when in fact Silver Fern had fabricated these communications and actually omitted this information from communications to RPC.

35. The Government filled the void caused by the Attorney General's failure to promulgate any regulations for record-keeping and reporting by persons handling 1,4 Butanediol, by looking to Silver Fern's fabricated documents. See 21 U.S.C. § 841(g)(3).

36. DEA Contract Investigator Jerry Salameh testified on September 2, 2020, that in order for RPC to comply with federal law, it would have needed to "maintain the same protocols...Silver Fern Chemical put on Right Price Chemicals as certifying Right Price Chemicals was an authorized buyer and meeting all the parameters of the vetting procedure."

37. Silver Fern then fabricated information and sent it to the Government about what such a procedure looked like by providing fabricated emails in an attempt to show a "history" indicating Silver Fern was behaving according to a fictitious standard.

38. This fictitious standard created by Silver Fern resulted in Plaintiffs being criminally charged under a vague regulatory framework

created under "suspension of the rules" as opposed to the proper legislative procedure which requires notice and hearing for debate.

39.  Plaintiffs suffered additional harm when the Government used the fraudulent documentation and emails from SFC along with the fictitious standard SFC fabricated to seize and destroy hundreds of thousands of dollars of hand-sanitizer and chemical inventory from RPC completely unrelated to 1,4 Butanediol.

40.  The fraudulent conduct by SFC including the fabricated emails and SDS along with the fictitious voluntary "industry standard" and "due diligence" practices created the basis for the Governments' attempts at civil and criminal prosecution.

41.  In its first response to the Government subpoenas sent to Silver Fern, no end user forms were provided. This is likely because Silver Fern had interpreted the statute as not requiring those forms. By going back in time to manipulate emails allegedly sent before the regulations changed and caused confusion related to the standard of care for end user forms. Silver Fern put pressure on their employees to make sure that the standard created in 2019 was documented as having been implemented by Silver Fern in response to the documents that were to be provided to the Government in its

investigation of RPC. Silver Fern, therefore, created a fraudulent standard through its manipulation and fabrication of information to cover its tracks. This information was then used in the criminal prosecution of RPC.

42.   One of Silver Fern's final acts of fraud occurred on or about June 29, 2020 when Silver Fern made a decision to stop selling 1,4 butanediol and notified *other Silver Fern customers* but **intentionally did not notify RPC**. If Silver Fern had alerted RPC it was discontinuing supply and any reason why the parties dealings together related to 1,4 butanediol should change in away from its prior course, RPC would have acted. Instead, this critical omission constitutes actionable fraud that harmed all Plaintiffs as alleged in this Complaint. Exhibit 9.

---

From: Sam King <sam@silverfernchemical.com>
Sent: Monday, June 29, 2020 10:14 AM
To: Gilda Franco <gilda@silverfernchemical.com>; Troy Kinto <troy@silverfernchemical.com>
Subject: RE: right price

Gilda,

I just spoke to Troy who is going to communicate with the customer.

Our course of intended action is to advise the customer that we have no available supply due to procurement issues from supplier.   And that no further information will be provided. i.e. if the customer asks just say we're having issues procuring material from our vendor at the moment.

We are <u>not</u> telling them we're getting out of the business at this point.

Call me with any questions.

Sam

Sam King
President

Silver Fern Chemical Inc
**Direct Line: (805) 960-5138**
Main Office: ph (866) 2823384 ext 104
Mobile: (206)779-2305
www.silverfernchemical.com

## DECLARATORY RELIEF REQUESTED

43.    Pursuant to 28 U.S.C. §2201 and FRCP 57, there exists a controversy of a justiciable nature related to the construction of 21 USC § 813, the defined term "distribution" and the requisite intent needed to establish the elements of the crime alleged against the Plaintiffs which arose from and was supported by the Silver Fern communications which the Government claimed established a standard of care in relation to compliance.

## REGULATORY FRAMEWORK

44.    The Drug Enforcement Administration (DEA) is involved in regulatory activity and enforcement of the diversion of certain listed chemicals and scheduled substances. See Review of the Drug Enforcement Administration's Regulatory and Enforcement Efforts to Control the Diversion of Opioids, Evaluation and Inspections Division 19-05, September 2019 (Revised) Exhibit 10.

45.    DEA's Office of Diversion Control is responsible for ensuring that all controlled substance transactions take place within the closed system of distribution established by Congress.

46.    When controlled substance transactions fall outside the closed system of distribution, the activity constitutes diversion.

47.   DEA Diversion Investigators enforce the CSA, the Chemical Diversion and Trafficking Act of 1987, and DEA regulations to ensure compliance by all current and prospective registrants.

48.   Directly from the OIG report at p. 8:

[29] The Chemical Diversion and Trafficking Act of 1987 amended the CSA to establish recordkeeping and reporting requirements for the manufacture, distribution, importation, and exportation of listed precursor and essential chemicals.  The Chemical Diversion and Trafficking Act prohibits the distribution of such chemicals unless the recipient provides a certification of lawful use and proper identification.  See P.L. 100-690 and 21 U.S.C. §§ 801–971.

8

49.   The definitions provided in 21 USC 802 are critical to understanding the enforcement structure. For example, at 802(32)(A) the term "controlled substance analogue" is defined through a list of three characteristics set forth in (i)-(iii).

50.   At 21 USC 802(C), the definition is further modified to state at (iv) that any substance to the extent not intended for human consumption is not a controlled substance analogue.

51.   Plaintiffs seek a determination that 21 USC § 813 and 21 USC § 841(g) are void for vagueness and the enforcement is a violation of the nondelegation doctrine.

52.   21 USC § 813 was revised in 2018. The revision added a list of factors as an attempt to establish some guidance for "determining whether

a controlled substance analogue was intended for human consumption."

53. 21 USC §813 provides for treatment of controlled substance analogues, to the extent intended for human consumption, be treated as a controlled substance.

54. As it pertains to RPC, 21 USC § 813 requires the Government to show 1,4–butanediol is intended for human consumption not just "use for human consumption" if they want it to be treated like a controlled substance which imposes strict liability simply for unauthorized possession and distribution. Before amendments made to 21 USC 813 in 2018 (2018-Pub.L. 115-271 designated provisions as subsec.(a), inserted heading, and added subsecs. (b) and (c)), it was enough to simply have a disclaimer label on the bottle that stated the product sold was not intended for human consumption.

55. The term "distribute" under the act is a defined term that means "(11) The term "distribute" means to deliver (other than by administering or dispensing) **a controlled substance or a listed chemical**.

56.   There is no distribution without it being treated as a controlled substance or a listed chemical. You can only treat 1,4–butanediol as a controlled substance if it is intended to be used for human consumption.

57.   The definition of the word "distribute" is also crucial to how intent must be proven even under 841(g).

58.   Further, though, Congress made clear in 841(g)(3) that in order for enforcement to be possible, specifically for 1,4 Butanediol, a set of rules for record keeping would first need to be promulgated by the U.S. Attorney General. This has never been done.

59.   The language chosen by Congress must be given meaning and it is a condition precedent to enforcement that the Attorney General promulgate regulations for record-keeping and reporting by persons handling 1,4 butanediol in order to enforce 21 USC 841(g).

60.   To replace the Attorney General's failure to promulgate rules, the DEA sought to use Silver Fern to establish a set of rules in an unlawful delegation of its power to the DEA.

61.   Congress did not authorize the DEA to promulgate rules and regulations related to the 1,4 Butanediol and it certainly did not authorize Silver Fern to do so.

## COUNT ONE: COMMON LAW FRAUD

62. The elements of common law fraud are (1) "a material misrepresentation" that (2) "was false," (3) "was either known to be false when made or was asserted without knowledge of its truth," (4) "was intended to be acted upon," (5) "was relied upon," and (6) "caused injury." *Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 153 (Tex. 2015) (quoting *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998)).

63. Under Texas law, a fraudulent representation underlying a common law fraud claim may be based on the defendant's misrepresentation to another if either: (1) The defendant intended for the misrepresentation to be repeated to and deceive the plaintiff. (2) The defendant knew the misrepresentation was especially likely to reach and influence plaintiff's conduct. *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 578-80 (Tex. 2001).

64. A defendant who acts with knowledge that a result will follow is considered to intend the result. See generally *Formosa Plastics Corp. v. Presidio Eng'rs Contractors*, Inc., 960 S.W.2d 41, 48-49 (holding that evidence the defendant knew the plaintiff would rely on its representations supported fraud finding).

65.    Fraud by non-disclosure is a theory by which the misrepresentation element of fraud can be proven.

66.    Fraud by non-disclosure is premised on the notion that silence may be as misleading as a positive misrepresentation of facts.

67.    Fraud by non-disclosure is implicated by RPC's prior course of dealings with Silver Fern and by the fact that Silver Fern had provided RPC critical information through the course of its dealings with RPC, such as the SDS which was relied on by RPC.

68.    Silver Fern had a duty to disclosure information because making a partial disclosure or omitting the disclosure it was exiting the market created a false impression to RPC while at the same time Silver Fern was fabricating evidence that it had informed RPC of the standard.  Exhibit 11.

**COUNT TWO: NEGLIGENT MISREPRESENTATION**

69.    The elements of negligent misrepresentation are: (1) the representation in question was made by the defendant in the course of his business or in a transaction in which he had a pecuniary interest, (2) the defendant supplied false information for the guidance of others in their business, (3) the defendant did not exercise reasonable care or competence in obtaining or

communicating the information, and (4) the plaintiff suffered pecuniary loss by justifiably relying on the representation. *Fed. Land Bank Ass'n of Tyler v. Shane*, 825 S.W.2d 439, 442 (Tex. 1991); see also *Roof Sys., Inc. v. Johns Manville Corp.*, 130 S.W.3d 430, 439 (Tex. App.-Houston [14th Dist.] 2004, no pet.) ("The false information' contemplated in a negligent misrepresentation case is a misstatement of existing fact, not a promise of future conduct.").

### COUNT THREE: CONSTRUCTIVE FRAUD

70. Constructive fraud is "the breach of a legal or equitable duty that the law declares fraudulent because it violates a fiduciary relationship. *Hubbard v. Shankle*, 138 S.W.3d 474, 483 (Tex. App.—Fort Worth 2004, pet. denied). "A fiduciary relationship may arise from formal and informal relationships and may be created by contract." *Lundy v. Masson*, 260 S.W.3d 482, 501 (Tex. App.—Houston [14th Dist.] 2008, no pet.). An informal fiduciary relationship, however, "may arise where one person trusts in and relies upon another, whether the relationship is a moral, social, domestic, or purely personal one." Id. (quoting *Jones*, 196 S.W.3d at 449). In other words, a fiduciary relationship "exists where a special confidence is reposed in another who in equity and good conscience is bound to act in

good faith and with due regard to the interests of the one reposing confidence." *Tex. Bank & Trust Co. v. Moore*, 595 S.W.2d 502, 507 (Tex. 1980) (quoting Lappas v. Barker, 375 S.W.2d 248, 251 (Ky. 1964)).

## REQUEST FOR RELIEF

71.   The Daughtry Family owns real estate and operated lawful family businesses in Jefferson County, Texas for decades. The Daughtrys are Southeast Texas natives who have worshiped, worked, lived and raised their family in this community their entire lives.

72.   In 1968, Sandra began working for the City of Nederland. She went on to work there for 32-years before retiring in 2000.

73.   In 1986, Joe established Daughtry Signs. He started by fabricating portable signs to rent and sell to other local small businesses.

74.   Daughtry Signs eventually expanded to a full-service sign business including sign painters, welders, fabricators and maintenance services. Customers included businesses such as Sonic, Burger King, Conn's, Market Basket, 5 Point Credit Union, convenience stores and outdoor billboards for MDF Outdoor.

75.   Jake's Fireworks was established in 1990. Named after their son Jake, who was just 4 years old at the time, the fireworks business progressed from a lease with two small outdoor stands to two larger and nicer stands.

76.   Being in Southeast Texas, there were advantages to the customers' comfort if they could shop for fireworks inside out of the weather, so the Daughtrys eventually decided to build a small indoor stand.

77.   In 2002, with some help, the Daughtrys were blessed to be able to purchase property and build the 10,000 square foot building that has since been known as Jake's Fireworks, one of largest indoor retail firework buildings in the State of Texas.

78.   Having built a customer base for over 30 years, the Jake's Fireworks business provided the Daughtrys supplemental income which they eventually used as a means to help with college tuition payments while Jake attended Texas A & M University.

79.   In 2009, Jake established Right Price Chemicals (RPC), an online retail business that sold industrial chemicals and laboratory supplies.

80.   Best Buy Industrial Supply, LLC was established by Jake Daughtry in 2015 and had built a customer base across the United States.

81.   Jake's RV Park is a 38-site development that was developed in 2010 and consistently booked at greater than 80% occupancy.

82.   Since 2010, the Daughtry family has sold Derksen portable buildings on commission.

83.   Daughtry Investments, LLC owned and operated a pre-existing Washateria business.

84.   Lab Chemical Supply, LLC also sold chemicals and laboratory supplies including items such as Isopropyl Alcohol which had become the largest volume product during the Covid-19 pandemic.

85.   On January 18, 2022, the indictment against Sandra Daughtry was dismissed. However, the other Plaintiffs continue to litigate to prove their innocence.

86.   Plaintiffs seek direct damages from fraud, actual damages, exemplary damages for fraud, prejudgment and postjudgment interest, reasonable attorneys' fees, consequential damages, expert fees, court costs, damages that in reasonable probability will be sustained in the future.

## DEMAND FOR A JURY TRIAL

87.   Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a jury trial for all issues in this matter.

## **PRAYER**

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff, herein, prays in the manner and particulars noted above, including and especially as to the declaratory relief requested; actual damages, attorney's fees and costs for the preparation and trial of this cause of action, and for its appeal if required, together with pre-and post-judgment interest for same, and for such other relief as this Court may deem just and proper, whether at law or at equity or as to both.

Respectfully Submitted,

THE MONK LAW FIRM

*/ s/ Brandon P. Monk*
BRANDON P. MONK
State Bar No. 24048668
4875 Parker Drive
Beaumont, Texas 77705
Phone: (409) 724-6665
Fax: (409) 729-6665
brandon@themonklawfirm.com

ATTORNEY FOR PLAINTIFFS